Christopher C. Voigt
Whitney M. Kolivas
CROWLEY FLECK PLLP
1915 South 19th Ave.
P.O. Box 10969
Bozeman, MT 59718
Telephone: 406-556-1430
Facsimile: 406-556-1433
E-Mail: cvoigt@crowleyfleck.com
        wkolivas@crowleyfleck.com

*Attorneys for Philadelphia Indemnity Insurance Company*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) ) ) | Cause No.: _____ |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | **COMPLAINT FOR DECLARATORY RELIEF** |
| BEAR PAW DEVELOPMENT CORPORATION OF NORTHERN MONTANA, a/k/a BEAR PAW DEVELOPMENT CORPORATION, | ) ) ) ) ) | |
| Defendant. | | |

_____

Pursuant to 28 U.S.C. § 2201 *et seq.*, and Rule 57 of the Federal Rules of

Civil Procedure, Plaintiff Philadelphia Indemnity Insurance Company ("PIIC"), by

and through its attorneys, brings this Complaint for Declaratory Relief against

Defendant Bear Paw Development Corporation of Northern Montana, a/k/a Bear

Paw Development Corporation ("Bear Paw"), stating as follows:

## NATURE OF ACTION

1.     This is a declaratory judgment action regarding insurance coverage.

Through this action, PIIC seeks to have this Court declare that: (1) the insurance

policies issued by PIIC to Defendant Bear Paw do not provide coverage for the

claims asserted against Bear Paw by J.R. Inman in *Inman v. AMEC Foster Wheeler*

*Environment & Infrastructure, Inc. et al.*, DV-3-2014-47-BC, filed in the

Seventeenth Judicial District Court, Blaine County, Montana ("Underlying

Lawsuit"); (2) that PIIC therefore has no duty to defend or indemnify Bear Paw for

the claims Inman asserts against it in the Underlying Lawsuit; and (3) that PIIC is

entitled to withdraw from the defense of Bear Paw in the Underlying Lawsuit.

## PARTIES

2.     Plaintiff PIIC is an insurance business corporation organized and

existing under the laws of the State of Pennsylvania.  PIIC was authorized to

transact business in the State of Montana at all relevant times. PIIC's principle

place of business is Bala Cynwyd, Pennsylvania.

3.     Bear Paw is a public benefit corporation with members organized

under the law of the State of Montana with its principal place of business located in

Havre, Hill County, Montana.

## JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the

amount in controversy exceeds $75,000.00 exclusive of interest and costs.

5.       This Court has jurisdiction over the subject matter of this action

pursuant to 28 U.S.C. 2201 *et seq.* because there is uncertainty and insecurity

regarding the rights, status, and other legal relations between the parties with

respect to whether PIIC has a duty to defend or indemnify Bear Paw under the

relevant insurance policies.

6.       This Court has personal jurisdiction over PIIC because (a) it is a

company that at all times relevant to this action transacted business in Montana,

and (b) it entered into a contract to insure persons within Montana at the time of

contracting.  *See* Mont. R. Civ. P. 4(b)(1)(A), (D).

7.       This Court has personal jurisdiction over Bear Paw because it is a

corporation organized under the laws of the State of Montana with its principal

place of business located in Hill County, Montana.

8.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and Local

Rule 1.2(c)(2) in light of the allegations set forth in paragraphs 2-3 and 10-30.

9.      A determination of the parties' respective rights with respect to whether PIIC has a duty to defend or indemnify Bear Paw would terminate the uncertainty or controversy giving rise to this proceeding

## FACTUAL ALLEGATIONS ENTITLING PIIC TO DECLARATORY RELIEF

**A.      Underlying Lawsuit**

10.     This matter arises from the Underlying Lawsuit, originally filed on November 24, 2017, by J.R. Inman, originally captioned *Inman v. AMEC Foster Wheeler Environment & Infrastructure, Inc. et al.*, Montana Seventeenth Judicial District Court, Blaine County, Cause No. DV-3-2014-47-BC (Complaint attached as Exhibit A).

11.     The Underlying Lawsuit alleges that in or about April, 2011, J.R. Inman was approached by a representative of Bear Paw about the suspected presence of an underground storage tank on Inman's property.

12.     The Underlying Lawsuit alleges that Bear Paw's representative informed Inman that Bear Paw had a Brownsfield program that would have Inman's property tested for an underground storage tank at no cost to Inman.

13.     The Underlying Lawsuit alleges that Bear Paw's representative informed Inman that Bear Paw would arrange for the removal of any underground

storage tank and the clean-up of any associated petroleum leakage.

14.     The Underlying Lawsuit alleges that Bear Paw's representative mentioned Montana's Petroleum Tank Release Compensation Fund ("PTRB") and explained to Inman that any cost sharing required by the PTRB would be covered by Bear Paw's Brownsfield program.

15.     The Underlying Lawsuit alleges that Bear Paw's representative assured Inman that he would bear no personal costs for the underground storage tank testing, removal, or environmental remediation, and any such costs or expenses would be borne by Bear Paw's Brownsfield program.

16.     The Underlying Lawsuit alleges that, under Bear Paw's direction, on or about May 11, 2011, Inman's property was tested for the presence of underground storage tanks and an underground storage tank was discovered.

17.     The Underlying Lawsuit alleges that on or about November 1, 2011, an application for an underground storage tank closure permit was submitted in connection with Inman's property.  The permit was granted and on or about November 10, 2011, and an underground storage tank was removed from Inman's property pursuant to the permit.

18.     The Underlying Lawsuit alleges that during the removal of the first underground storage tank, a second underground storage tank was discovered on

Inman's property and immediately removed, even though the closure permit only referred to the first underground storage tank.

19.     The Underlying Lawsuit alleges that soil tests from beneath the first and second underground storage tanks revealed that petroleum contamination had occurred on Inman's property, but had not come from the first underground storage tank.

20.     The Underlying Lawsuit alleges that on or about December 12, 2011, a thirty (30) day Petroleum Release Notification form was prepared and submitted to the Montana Department of Environmental Quality.

21.     The Underlying Lawsuit alleges that Inman applied for PTRCB reimbursement eligibility on or about January 9, 2012.

22.     The Underlying Lawsuit alleges that in March of 2012 an application to amend the closure permit to include the second underground storage tank located on Inman's property was submitted and approved on or about March 16, 2012.

23.     The Underlying Lawsuit alleges that on or about March 23, 2012, the PTRCB denied Inman's reimbursement eligibility for failing to apply for a closure permit within thirty (30) days of the date Inman first had knowledge of the second underground storage tank.  Inman's ineligibility was confirmed on or about May

14, 2012, during a PTRCB hearing.

24.     The Underlying Lawsuit alleges that Bear Paw, and others, strongly encouraged Inman to appeal the PTRCB's ineligibility determination, which Inman did.  On or about August 29, 2014, the PTRCB entered its final order denying Inman's PTRCB reimbursement eligibility due to Inman's failure to timely apply for a closure permit and for closure of an underground storage tank without a proper permit.

25.     The Underlying Lawsuit alleges that since the discovery and removal of the first two underground storage tanks, four additional underground storage tanks have been located and removed from Inman's property pursuant to additional permits.  It is alleged that all of the additional underground storage tanks have leaked petroleum.

26.     The Underlying Lawsuit alleges that Bear Paw was negligent when it failed to exercise reasonable care in the testing and closure of the underground storage tanks located on Inman's property, including failing to properly test the property and thereby discover the existence of the second through sixth tanks prior to the first tank's removal; removing the second tank without a valid closure permit; failing to submit the thirty (30) day Petroleum Release Notification form within thirty (30) days of the second tank's discovery; failing to apply for a closure

permit for the second tank within thirty (30) days of the second tank's discovery; and performing testing for petroleum leakage that failed to account for the presence of four additional underground storage tanks (Count I).

27.    The Underlying Lawsuit alleges that Bear Paw breached its contract with Inman by failing to ensure that proper permitting was in place so that Inman's property qualified for PTRCB reimbursement (Count II).

28.    The Underlying Lawsuit alleges that Bear Paw made negligent misrepresentations to Inman by representing that Bear Paw would handle, and Inman would bear no personal financial responsibility for, all aspects of testing, closure, removal, clean up, and remediation of any underground storage tanks and any associated petroleum leakage on Inman's property (Count III).

29.    The Underlying Lawsuit alleges that Bear Paw committed constructive fraud by providing Inman with false information and thereby persuading him to submit to underground storage tank testing; failing to identify all underground storage tanks located on Inman's property; failing to secure necessary permits for the removal of all underground storage tanks located on Inman's property; removing the second underground storage tank located on Inman's property without a valid permit; and encouraging Inman to appeal the PTRCB's ineligibility determination (Count IV).

30.     The Underlying Lawsuit alleges that Inman has suffered and continues to suffer economic damages due to Bear Paw's wrongful acts.

**B.     The Policies**

31.     Relevant to the Underlying Lawsuit, PIIC issued two policies to Bear Paw:

(a)     Policy Number PHPK1605937 with a policy period from February 6, 2017 to February 6, 2018 (the "2017-18 Policy); and

(b)     Policy Number PHPK826465 with a policy period from February 6, 2012 to February 6, 2013 (the "2012-13 Policy").

32.     The 2017-18 Policy provided (a) commercial general liability coverage under coverage form GC 00 01 04 13 and (b) professional liability claims-made coverage under coverage form PI-HS-004 (07/04) (Complete certified copy of 2017-18 Policy attached as Exhibit B) (The relevant coverage forms are attached as Exhibits C and D).  PIIC incorporates the Policy and coverage parts attached as Exhibits B-D as though set forth fully here.

33.     Coverage under the 2017-18 Policy's commercial general liability form – Coverage A, provides:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to

defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Ex. C at 4).  Coverage under the 2017-18 Policy's commercial general liability

form – Coverage B, provides:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

(Ex. C at 9).

34.    Coverage under the 2017-18 Policy's commercial general liability

coverage form is limited to "bodily injury" or "property damage" or "personal and

advertising injury" that "occurs during the policy period" and was not known prior

to the policy period.  (Ex. C at 4, 9).

35.    "Bodily injury" is defined by the 2017-18 Policy's commercial

general liability coverage form as "bodily injury, sickness or disease sustained by a

person, including death resulting from any of these."  (Ex. C at 16).

36.    "Property damage" is defined by the 2017-18 Policy's commercial

general liability coverage form as:

**a.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of

the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured.  All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Ex. C at 18-19).

37.     "Personal and advertising injury" is defined by the 2017-18 Policy's

commercial general liability coverage form as

[I]njury, including consequential 'bodily injury', arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;
b. Malicious prosecution;
c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
f. The use of another's advertising idea in your "advertisement"; or
g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

(Ex. C at 18).

38.    "Occurrence" is defined by the 2017-18 Policy's commercial general liability coverage form as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Ex. C at 18).

39.    Even if coverage is initially triggered, the 2017-18 Policy's commercial general liability coverage form contains the following exclusions from coverage:

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement[.]

\*\*\*

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

\*\*\*

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of an governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**\*\*\***

**j.  Damage to Property**

"Property damage" to:

**\*\*\***

**(5)**  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**\*\*\***

Paragraphs **(3), (4), (5) and (6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

(Ex. C at 6-8).

40.     Pursuant to endorsement PI-HS-005 (07/04) – Exclusion Professional

Liability Coverage, the 2017-18 Policy's commercial general liability coverage

form also excludes coverage for "'bodily injury', 'property damage' or 'personal

and advertising injury' arising out of … [a] a 'professional incident.'"  (Ex. C at

45).

41.     Pursuant to endorsement PI-HS-005 (07/04) – Exclusion Professional

Liability Coverage, the 2017-18 Policy defines a "professional incident" to mean

"any actual or alleged negligent: a) act; b) error; or c) omission."  (Ex. C at 45).

42.     Coverage under the 2017-18 Policy's Human Services Organization

Professional Liability Claims-Made coverage form provides:

> We will pay those sums that the insured becomes legally obligated to pay as
> damages  arising out of a "professional incident" in the course of performing
> professional services for, or on behalf of, your human services organization
> to which insurance applies.  We have the right and duty to defend any "suit"
> seeking those "damages".  We may at our discretion investigate and settle
> any "professional incident", subject to **SECTION IV – CONDITION** K,
> any claim or "suit".

(Ex. D at 3).

43.     The 2017-18 Policy's professional liability coverage form provides

"claims-made" coverage, which includes the following provisions:

> This insurance applies to "damages" only if:

a. the "damages" result from a "professional incident" that takes place in the "coverage territory"; and

b. the "professional incident" did not occur before the Retroactive Date, if any, shown in the Declarations or after the end of the policy period; and

c. a claim for "damages" because of the "professional incident" is first made against any insured, in accordance with paragraph 3. below, during the policy period or any Extended Reporting Period[.]

(Ex. D at 3).

44.     The 2017-18 Policy's professional liability coverage form defines a "professional incident" to mean:

any actual or alleged negligent:

a. act;

b. error; or

c. omission

in the actual rendering of professional services to others, including counseling services, in your capacity as a human services organization. …

Any or all "professional incidents" arising from interrelated or series of acts, errors or omissions shall be deemed to be one "professional incident" taking place at the time of the earliest "professional incident."

(Ex. D at 11-12).

45.     The retroactive date listed in the professional liability coverage form's Declarations is February 6, 2003.  (Ex. D at 1).

46.     Even if coverage is initially triggered by a claim of a "professional incident," the 2017-18 Policy's professional liability coverage form contains the following exclusions from coverage:

> This insurance does not apply to "damages": …
>
> 2. for any actual or alleged breach of contract or agreement.  This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement;
>
>     ***
>
> 13. arising out of damage to property:
>
>     ***
>
>     d.  that is real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are or were performing operations;
>
> 14. arising out of any:
>
>     a.  "pollution hazard";
>
>     ***
>
> 22.  arising out of acts, errors or omissions of a managerial or administrative nature[.]

(Ex. D at 3-5).

47.     The 2017-18 Policy's professional liability coverage form defines a "pollution hazard" as:

> **O.  "Pollution hazard"** means:

    1.  any actual, alleged or threatened emission, discharge, dispersal, seepage, mitigation, release or escape of pollutants at any time; or

      a.  any clean up of pollutants; or

      b.  any request, demand or order for any clean up of pollutants;

    2.  the investigation, settlement or defense of any claim, "suit", proceeding, "damages", loss, cost or expense excluded by 1. above.

Pollutants include any noise, solid, semi-solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, mists, acids, alkalis, chemicals, biological and etiological agents or materials, electromagnetic or ionizing radiation and energy, genetically engineered materials, teratogenic, carcinogenic and mutagenic materials, waste and any other irritant or contaminant.

Waste includes any materials to be disposed, recycled, reconditioned or reclaimed.

Clean up of includes monitoring, removal, containment, treatment, detoxification or neutralization of, testing for or response in any way to, or assessment of the effects of pollutants.

(Ex. D at 11).

    48.    Pursuant to endorsement PI-PPL-001 HS (05/13) – Prior and Pending Litigation Exclusion, the 2017-18 Policy's professional liability coverage form also excludes coverage for:

    **1.**  Any litigation, demand, legal action, claim, "suit" or other judicial or administrative proceeding which has commenced or is pending against you on or before the date set forth below, or the same or essentially the same facts as alleged in such prior litigation;

***

**3.** Any "professional incident," fact, circumstance or situation as of the date set forth below of which you had knowledge and from which you could reasonably expect a claim for damages or a "suit" to arise.

Prior and Pending Litigation Date:    02/06/2012

(Ex. D at 14).

49.    The 2012-13 Policy provided (a) commercial general liability coverage under coverage form CG 00 01 12 07 and (b) professional liability coverage under coverage form PI-HS-003 (07/04) (Complete certified copy of 2012-13 Policy attached as Exhibit E) (The relevant coverage forms are attached as Exhibits F and G).  PIIC incorporates the Policy and coverage parts attached as Exhibits E-G as though set forth fully here.

50.    Coverage under the 2012-13 Policy's commercial general liability form – Coverage A, provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Ex. F at 4).  Coverage under the 2017-18 Policy's commercial general liability form – Coverage B, provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

(Ex. F at 9).

51.    Coverage under the 2012-13 Policy's commercial liability coverage form is limited to "bodily injury" or "property damage" or "personal and advertising injury" that occurs during the policy period.  (Ex. F at 4, 9).

52.    "Bodily injury" is defined by the 2012-13 Policy's commercial general liability coverage form as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  (Ex. F at 16).

53.    "Property damage" is defined by the 2012-13 Policy's commercial general liability coverage form as:

> **a.** Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> **b.** Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

> For the purposes of this insurance, electronic data is not tangible property.

> As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or

floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Ex. F at 18).

54.     "Personal and advertising injury" is defined by the 2012-13 Policy's

commercial general liability coverage form as:

[I]njury, including consequential 'bodily injury', arising out of one or more of the following offenses:

a.  False arrest, detention or imprisonment;
b.  Malicious prosecution;
c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization of disparages a person's or organization's goods, products or services;
e.  Oral or written publication, in any manner, of material that violates a person's right of privacy;
f.  The use of another's advertising idea in your 'advertisement;" or
g.  Infringing upon another's copyright, trade dress or slogan in your 'advertisement'.

(Ex. F at 17).

55.     "Occurrence" is defined by the 2012-13 Policy's commercial general

liability coverage form as "accident, including continuous or repeated exposure to

substantially the same general harmful conditions."  (Ex. F at 17).

56.     Even if coverage is initially triggered under the insuring agreement,

the 2012-13 Policy's commercial general liability coverage form also contains the

following exclusions from coverage:

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement[.]

\*\*\*

**f. Pollution**

(3) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

\*\*\*

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

\*\*\*

**j.  Damage to Property**

"Property damage" to:

\*\*\*

**(5)**  That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

\*\*\*

Paragraphs **(3), (4), (5) and (6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

\*\*\*

(Ex. F at 5-8).

57.     The 2012-13 Policy's commercial general liability coverage form also

excludes coverage for 'bodily injury', 'property damage' or 'personal and

advertising injury' arising out of … [a] a 'professional incident'" pursuant to

endorsement PI-HS-005 (07/04) – Exclusion Professional Liability Coverage.  (Ex.

F at 39).  A "professional incident" means "any actual or alleged negligent: a) act;

b) error; or c) omission."  (Ex. F at 39).

58.     Coverage under the 2012-13 Policy's Human Services Organization

Professional Liability coverage form provides:

> We will pay those sums that the insured becomes legally obligated to pay as "damages" arising out of a "professional incident" in the course of performing professional services for, or on behalf of, your human services organization to which this insurance applies.  We have the right and duty to defend any "suit" seeking those "damages".  We may at our discretion investigate and settle any "professional incident", subject to **SECTION IV – CONDITION K**, any claim or "suit".

(Ex. G at 3).

59.     Coverage under the 2012-13 Policy's professional liability coverage

form is limited to "damages" resulting from a "professional incident" that takes

place in the "coverage territory" and during the policy period.  (Ex. G at 3).

60.     The 2012-13 Policy's professional liability coverage form defines

"professional incident" as:

> any actual or alleged negligent:
>
> a. Act;
>
> b. Error; or
>
> c. Omission

in the actual rendering of professional services to others, including counseling services, in your capacity as a human services organization. …

Any or all "professional incidents" arising from interrelated or series of acts, errors or omissions shall be deemed to be one "professional incident" taking place at the time of the earliest "professional incident."

(Ex. G at 11).

61.    Even if coverage is initially triggered by a claim of a "professional incident," the 2012-13 Policy's professional liability coverage form contains the following exclusions from coverage:

2.  For any actual or alleged breach of contract or agreement.  This exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement.

***

13. Arising out of damage to property:

***

d.  That is real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are or were performing operations.

14. Arising out of any:

a.  "Pollution hazard";

***

22.  Arising out of acts, errors or omissions of a managerial or

administrative nature.

(Ex. G at 3-5).

62.     The 2012-13 Policy's professional liability coverage form defines a "pollution hazard" as "[a]ny actual, alleged or threatened emission, discharge, dispersal, seepage, mitigation, release or escape of pollutants at any time;" "[a]ny clean up of pollutants;" or "[a]ny request, demand or order for any clean up of pollutants."  This exclusion includes any associated "investigation, settlement or defense of any claim, 'suit', proceeding, 'damages', loss, cost or expense."  (Ex. G at 11).

## COUNT I – DECLARATORY RELIEF

63.     PIIC incorporates the allegations of the preceding paragraphs as though set forth fully here.

64.     The 2017-18 Policy does not provide coverage for the Underlying Lawsuit because:

        a.      The Underlying Lawsuit does not allege any covered "bodily injury," "property damage," or "personal and advertising injury."

        b.      All conduct giving rise to the Underlying Lawsuit occurred prior to the policy period.

        c.      Coverage is excluded by the exclusions set forth in paragraphs

A.2.b, f, and j of the commercial general liability coverage form.

d.    Coverage is excluded by the exclusion set forth in endorsement PI-HS-005 (07/04).

e.    Coverage is excluded under the exclusions set forth in paragraphs B.2, 13, 14, and 22 of the human services organization professional liability claims-made coverage form.

f.    Coverage is excluded by the exclusion set forth in endorsement PI-PPL-001 HS (05/13) to the human services organization professional liability claims-made coverage form.

g.    All alleged "professional incidents" and the facts, circumstances, and situations giving rise to the Underlying Lawsuit are interrelated, occurred, began occurring, and/or were known to Bear Paw prior to February 6, 2012.

h.    Bear Paw had knowledge of and could reasonably expect a claim for damages or a suit as a result of the alleged "professional incidents," facts, circumstances, or situations giving rise to the Underlying Lawsuit on or before February 6, 2012.

65.    The 2012-13 Policy does not provide coverage for the Underlying Lawsuit because:

a.    The Underlying Lawsuit does not allege any "bodily injury," "property damage," or "personal and advertising injury" covered under the commercial general liability coverage form.

b.    Coverage is excluded by the exclusions set forth in paragraphs A.2.b, f, and j of the commercial general liability coverage form.

c.    Coverage is excluded by the exclusions set forth in endorsement PI-HS-005 (07/04).

d.    Coverage is excluded by the exclusions set forth in paragraphs B.2, 13, 14, and 22 of the human services organization professional liability coverage form.

e.    All alleged wrongdoing occurred and/or began occurring prior to the policy period.

f.    All of the claims for relief in the Underlying Lawsuit are based upon and/or stem from interrelated conduct occurring prior to February 6, 2012.

g.    Bear Paw had knowledge of and could reasonably expect a claim for damages or a suit as a result of the alleged "professional incidents," facts, circumstances, or situations giving rise to the Underlying Lawsuit on or before February 6, 2012.

66.     PIIC requests that this Court declare that there is no coverage triggered under the 2017-18 Policy or the 2012-13 Policy for the claims asserted in the Underlying Lawsuit and that, correspondingly, PIIC has no duty to defend or indemnify Bear Paw against the claims asserted in the Underlying Lawsuit.

67.     PIIC requests this Court further declare that PIIC is entitled to withdraw any defense provided to Bear Paw in the Underlying Lawsuit and to recoup any costs of defense from Bear Paw.

## RELIEF REQUESTED

WHEREFORE, PIIC prays for the following relief:

1.     For a declaration that PIIC has no duty to defend or indemnify Bear Paw in the Underlying Lawsuit;

2.     For a declaration that PIIC is entitled to withdraw any defense of Bear Paw in the Underlying Lawsuit;

3.     For an award of reasonable costs and attorney fees as allowed by Montana law, both for this action and the Underlying Lawsuit; and

4.     For such other and further relief as this Court deems just and proper.

//

//

//

Dated this <u>27th</u> day of July, 2018.

> CROWLEY FLECK PLLP
>
> By <u>/s/ Whitney M. Kolivas</u>
> > Christopher C. Voigt
> > Whitney M. Kolivas
> > P.O. Box 10969
> > Bozeman, MT  59718
> > *Attorneys for Plaintiff*